AO 91 (Rev. 11/11)  Criminal Complaint

United States Courts
Southern District of Texas
FILED

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

*June 04, 2022*

Nathan Ochsner, Clerk of Court

Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| EMYLEE THAI | ) | |
| a/k/a THU THAI | ) | **4:22-mj-1272** |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 4, 2022, _____ in the county of _____ Harris _____ in the
_____ Southern _____ District of _____ Texas _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to defraud the United States |
| 42 U.S.C. § 1320a-7b(b)(1)(A) | Violation of the Anti-Kickback Statute |

This criminal complaint is based on these facts:

See attached affidavit in support of criminal complaint.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Shannon Brady, FBI Supervisory Special Agent
*Printed name and title*

Sworn to before me telephonically.

Date: _____ 06/04/2022 _____

_____
*Judge's signature*

City and state: _____ Houston, Texas _____

Hon. Sam S. Sheldon, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Shannon Brady, your affiant, being duly sworn, do depose and state as follows:

### A. Identity and Experience of Affiant

1.      Affiant has been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") for over eighteen years.  For approximately fourteen years, I have investigated Health Care Fraud matters, and I am currently assigned to a Health Care Fraud squad in the Houston Division.

### B. Purpose of the Affidavit

2.      This affidavit is made in support of a complaint and arrest warrant for EMYLEE THAI ("THAI") also known as THU THAI.

3.      This case is being investigated by the FBI, the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), and the Texas Office of Attorney General, Medicaid Fraud Control Unit ("MFCU").

4.      The information set forth herein is based upon my personal observations, my training and experience, discussions with other law enforcement agents and officers, documents and records that were collected and reviewed in the course of this investigation, information that was obtained from witnesses, and reports prepared by individuals familiar with the subject of this affidavit.

5.      Because this affidavit is provided for the limited purpose of establishing probable cause for an arrest, it does not include every known fact concerning this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause.  All figures, dates, and calculations set forth herein are approximate.

1

C.  **The Alleged Offenses**

6.      Federal law makes it a crime for two or more persons to conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons to do any act to effect the object of the conspiracy.  18 U.S.C. § 371.

7.      Federal law also makes it a crime to offer or pay money, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.  42 U.S.C. § 1320a-7b(b)(2)(A) ("Federal Anti-Kickback Statute").

D.  **The Medicare Program**

8.      Medicare is a federally funded health insurance program that provides health benefits to individuals who are 65 years of age or older or disabled.  It is a "health care benefit program" as defined by 18 U.S.C. § 24(b) and a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).  Medicare is administered by the Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services ("CMS").

9.      Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."  Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D").  Relevant here, Part B also covers laboratory testing, such as genetic testing, when certain criteria are met.

10.      When receiving and adjudicating claims, Medicare acts through fiscal intermediaries called Medicare Administrative Contractors ("MACs"), which are statutory agents

of CMS for Medicare Part B.  MACs are private entities that review claims and make payments

to providers for services rendered to beneficiaries.  MACs are responsible for processing

Medicare claims arising within their assigned geographical area, including determining whether

a claim is for a covered service.  Novitas Solutions, Inc. ("Novitas") is the MAC that oversees

Medicare Part B for Texas and other states.

11.     To receive Medicare reimbursements, providers, including clinical laboratories,

physicians, and others who provide services to beneficiaries, need to have applied to the assigned

MAC and executed a written provider agreement.  The Medicare provider enrollment

application, CMS Form 855B, must be signed by an authorized representative of the provider.

Form 855B contains a certification that states:

> I agree to abide by the Medicare laws, regulations and program
> instructions that apply to me . . . . The Medicare laws, regulations,
> and program instructions are available through the fee-for-service
> contractor. I understand that payment of a claim by Medicare is
> conditioned upon the claim and the underlying transaction
> complying with such laws, regulations, and program instructions
> (including, but not limited to, the Federal anti-kickback statute and
> the Stark law), and on the provider's compliance with all applicable
> conditions of participation in Medicare.

12.     In executing CMS Form 855B, providers further certify that they "will not

knowingly present or cause to be presented a false or fraudulent claim for payment by

Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their

truth or falsity."

13.     A Medicare "provider number" is assigned upon approval of the provider's

Medicare application.  A provider may use that number to file claims with, or "bill" Medicare to

obtain reimbursement for services rendered to beneficiaries.

14.     When seeking reimbursement from Medicare for items or services, providers submit the cost of the item or service provided and a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS").

15.     When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

**E.   Diagnostic Laboratory Testing Services**

16.     The Social Security Act, 42 U.S.C. § 1395y(a)(1)(A) states that no Medicare payment shall be made for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member."  As a condition of Medicare payment, a physician or other Medicare provider must certify that the services ordered and performed were reasonable and medically necessary.  42 U.S.C. § 1395n(a)(2)(B).

17.     Further, 42 C.F.R. § 410.32(a) provides, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."  Further, "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id*.

18.     Medicare would not pay for claims that were procured through kickbacks.

19.     Three common types of genetic tests are Cancer Genomics ("CGx"),

Pharmacogenomics ("PGx"), and cardiogenetic testing.  Generally, CGx tests can indicate an

increased risk of developing certain cancers in the future and can help providers determine the

appropriate course of treatment for a person diagnosed with cancer, but do not detect existing

cancer.  PGx tests can indicate how a patient's body handles certain medications based on their

genetic makeup and can help providers determine what medications to prescribe.  Cardiogenetic

tests can detect whether patients have a genetic mutation that indicates they have an inherited

heart disease.

### F.  Artemis DNA Previously Doing Business as ApolloMDx

20.     Artemis DNA TX, LLC ("Artemis DNA"), previously doing business as

ApolloMDx, LLC ("ApolloMDx"), is an independent clinical laboratory located at 900 S Loop

W, Suite 170 in Houston, Texas, and was incorporated in the State of Texas by THAI in May

2019.  THAI filed a certificate of amendment with the Texas Secretary of State in April 2021

changing ApolloMDx's name to Artemis DNA TX, LLC.

21.     On October 4, 2019, THAI submitted and signed ApolloMDx's Medicare

enrollment application.  ApolloMDx's Medicare National Provider Number ("NPI"),

1699330415, became active on November 22, 2019, and ApolloMDx began billing Medicare for

genetic testing on December 24, 2019.  As part of the enrollment process, THAI certified that

she agreed to abide by Medicare laws and regulations, including but not limited to the Federal

Anti-Kickback Statute, and that she would not knowingly present false claims or submit claims

with reckless disregard of their truth or falsity.  Since ApolloMDx's initial enrollment in

Medicare, it has retained the same NPI and operated as the same enterprise even after it was

5

renamed to Artemis DNA.  For simplicity's sake, this affidavit's references to ApolloMDx encompass both Artemis DNA and ApolloMDx.

22.     On October 6, 2020, THAI purchased the property located at 310 Goddard, Irvine, California which is the location of a second lab, ApolloMDx Labs, LLC.

23.     THAI applied for a Medicare number for this location which was approved on or about June 1, 2021.

24.     On August 18, 2021, an email search warrant was served on Google LLC for THAI's email account, emyleethai@gmail.com.  Law enforcement has received, and reviewed emails provided pursuant to that search warrant.

**G.  Probable Cause to Believe the Crimes of Conspiracy to Defraud the United States and to Pay Kickbacks Have Been Committed**

25.     From in or around December 2019 through May 2022, Medicare data reflects that ApolloMDx has billed approximately $146 million and has been paid approximately $97 million for genetic testing.

26.     As set forth below, I have probable cause to believe that THAI paid over $2 million in kickbacks to marketers for referrals of specimens and orders for genetic testing to be billed by ApolloMDx to Medicare, in violation of the Federal Anti-Kickback Statute.

27.     In early 2021, apparent company insiders filed anonymous complaints with HHS-OIG and the FBI.  The allegations, which have been corroborated as explained below, include that THAI paid kickbacks to MARKETER 1 for referrals of samples for genetic testing.

28.     On August 18, 2021, EMPLOYEE 1, a former ApolloMDx employee, was interviewed.  EMPLOYEE 1 indicated that THAI had existing sales representatives or marketers in California that THAI personally oversaw.  EMPLOYEE 1 dealt with new sales representatives brought in by MARKETER 1.  MARKETER 1 was considered a distributor and would receive

6

35% of the amounts Medicare paid on all tests performed on beneficiaries' samples while the representatives under MARKETER 1 would receive a portion of the 35%.

29.     Two sales representatives under MARKETER 1 were MARKETER 2 and MARKETER 3.  As an example of how payments would flow to the marketers, EMPLOYEE 1 explained that for a Medicare reimbursement attributable to a claim referred by one of MARKETER 1's representatives, the representative would receive 20% of the reimbursement while MARKETER 1 received the additional 15%.  EMPLOYEE 1 further advised that the contracts for the sales representatives made it appear as if the representatives were being paid a salary and that the referral relationship was compliant with the Eliminating Kickbacks in Recovery Act of 2018 ("EKRA"), when in fact the sales representatives were being paid a percentage of the reimbursements paid by Medicare.  The contract explicitly mentions the federal Anti-Kickback Statute and all applicable laws but does not specifically mention EKRA. However, EMPLOYEE 1, THAI, and the marketers all focused on EKRA.

30.     On May 13, 2022, EMPLOYEE 1 was interviewed again.  EMPLOYEE 1 was shown an email dated October 7, 2020, from EMPLOYEE 1 to MARKETER 1 and THAI, with a blank, "Direct Marketing Services Contract" attached to the email.   Attachment B to the contract was an "Annual Fee Schedule" which would lay out a quarterly fee for the year.  The fee schedule stated that "[ApolloMDx] and [MARKETER 1] acknowledge the aforementioned Flat Fees to be reasonable fair market value in the industry. . . .  For purposes of clarity, the Parties hereto expressly acknowledge the Flat Fees set forth here shall bear absolutely no correlation to the volume or quantity of Leads, Records, or Clients. . . nor will the Provider be making 'referrals,' as defined in federal and state statute."

31.     THAI had previously sent this contract to EMPLOYEE 1 on July 26, 2020, writing, "Can you DocuSign template this? This is for reps."  However, EMPLOYEE 1 explained during EMPLOYEE 1's May 13, 2022 interview that, contrary to the language in the agreement, the amounts paid to sales representatives were based entirely on volume.  According to EMPLOYEE 1, ApolloMDx would come up with an alleged salary based on the average of the percentage the sales representative would be paid for their referrals.

32.     Prior to sending this contract to MARKETER 1, THAI had knowledge that paying commissions to sales reps for Medicare referrals was illegal based on THAI's marketing for another lab in Houston, Texas (HOUSTON LAB 1), in addition to her certification to comply with the Federal Anti-Kickback Statute made in the Medicare enrollment application for ApolloMDx.  In late 2019 and early 2020, THAI had disputes with the lab owner for HOUSTON LAB 1 over payments for samples THAI referred to that lab, and in an email dated January 17, 2020, that lab owner wrote, "I told you [in November or December] that you were effectively asking me to pay based on a formula that amount to [*sic*] a commission and that such formulas were not in compliance with OIG rules related to the EKRA and Anti-kickback laws."  In fact, the "Direct Marketing Services Contract" THAI used with MARKETER 1 was copied almost verbatim from the marketing agreement for HOUSTON LAB 1 that THAI executed in June 2019.  That contract, according to an email from the owner of HOUSTON LAB 1, was based on "a contract structure where we pay marketers a fixed amount for marketing in order to become compliant with the new EKRA law that prohibits paying commissions of any kind related to healthcare sales."

33.     Notwithstanding THAI's knowledge that volume-based compensation for referrals was illegal, text messages between MARKETER 1 and THAI show that THAI's

payments to the marketers were based on volume.  On September 25, 2020, MARKETER 1

texted THAI, "So [MARKETER 2's] doctor did nine today and he called me and I said big deal

[MARKETER 3's] doctor did 25 LOL."  THAI responded, "Haha, get them competing w each

other."  "Will we get 2000 before Christmas?"  MARKETER 1 responded, "Ez.  Car n house,"

and THAI responded, "Bonus at 1000, then 5000."  Later in the exchange, THAI asked, "How

many cardio are you at right now? Lol," and MARKETER 1 responded, "I think [MARKETER

2] before today was 25.  [MARKETER 3] started today."  MARKETER 1 added,

"[MARKETER 3's] Dr did 28 cardio n 22 CGX.  You will get tomorrow or Monday."  Based on

my training and experience, this series of text messages demonstrates that sales representatives

were paid and incentivized based upon the number of referrals.

34.     On October 8, 2020, in a series of text messages, THAI and MARKETER 1

argued about MARKETER 1 negotiating pay for representatives.  THAI texted, "[MARKETER

1]. I'm still a little troubled by you verbally negotiating your agreement with your rep and then

pushing them to apollomdx after to be direct under us.  If you are throwing out promises without

first letting us know, we will not be able to honor them all – like you promising to pay

[MARKETER 2] x of $8,000 for y after 30 days.  This is just not possible because NGS take 2-4

weeks to run, then 2-3 weeks to get paid."  THAI went on to add, "Your reps can come on direct,

and we can minus their commission from yours if you want us to handle them, but the mutual

agreement should involve all the right parties."

35.     MARKETER 1 responded with, "I made no promises to anyone.  I as we [*sic*]

discussed w [EMPLOYEE 1] is to evaluate a reps work after 30-45 days.  Then come up with

what's call a 'training salary' for 60-90 days to determine what the rep is worth."  MARKETER

1 added, "Like I said. Every lab/rep when starting works on same premise. 30-45 evaluate n come up with salary.  It's EKRA."

36.    This series of text messages lay out the same scheme that EMPLOYEE 1 described for devising a salary related to the "Direct Marketing Sales Agreement" and demonstrate that the purpose of the contracts was to disguise that the sales representatives were paid based upon the volume of referrals.  Based on these messages, THAI viewed the payments to sales reps as a commission based on the expected volume and value of reimbursements, and further, the "salary" MARKETER 1 discussed and that MARKETER 1 and THAI agreed to was designed to conceal that the sales reps were receiving volume-based payments, including referrals of genetic tests reimbursed by Medicare, all in violation of the Federal Anti-Kickback Statute.

37.    After more back and forth conversation, THAI texted, "[MARKETER 1], you can negotiate your reps pay with them (since it's out of your pay lol) - just give us heads up so we are all on the same page, or get [EMPLOYEE 1] involved in the convo early."  MARKETER 1 ultimately responded, "Not my money.  Remember I only get 35% to play with."

38.    On October 27, 2020, in another exchange, MARKETER 1 texted, "So far Apollo willing to give you 30% and 100/test to me."  THAI responded back, "Don't know what you are talking about," and then added, "Apollo isn't giving anyone 30%."  MARKETER 1 replied, "Just spoke with [EMPLOYEE 1].  It was discussed 30 to rep 5 to me. No???"  A minute later MARKETER 1 added, "My Cardio deal is the same."  THAI responded, "No." After additional texts were exchanged, MARKETER 1 acknowledged, "No %.  I understand that.  Salary w ERKA [*sic*] based on production."  THAI responded back, "Fixed pay based on performance." This exchange occurred only a few weeks after MARKETER 1 and THAI explicitly discussed

MARKETER 1's commission as a percentage.  The above conversation shows that THAI, for an unknown reason, was no longer comfortable discussing payments via text message.

39.     Affiant obtained bank records from ApolloMDx, MARKETER 1, and MARKETER 2, to determine the amount of kickbacks paid by THAI for referrals of genetic testing, in violation of the Federal Anti-Kickback Statute.

40.     From August 5, 2020, through November 26, 2021, MARKETER 1's bank records show that ApolloMDx paid a combined total of approximately $706,000 into MARKETER 1's two business accounts, CORPORATE ACCT 1 and CORPORATE ACCT 2. On September 1, 2020, MARKETER 1 sent a text stating, "Here is the new account n info for rep sales.  Continue to use the other account ([CORPORATE ACCT 2]) for everything else." Attached to the text was a photo of a voided check for CORPORATE ACCT 1.  CORPORATE ACCT 2 received approximately $396,000 and CORPORATE ACCT 1 received approximately $310,000.

41.     From October 5, 2020, through May 20, 2021, MARKETER 2's bank records show ApolloMDx paid approximately $630,000 into MARKETER 2's business account, CORPORATE ACCT 3.

42.     From December 4, 2020, through September 23, 2021, a review of one of ApolloMDx's accounts shows ApolloMDx paid MARKETER 3 approximately $719,000.  One transaction was to a personal account and the other transactions were to CORPORATE ACCT 4.

43.     A review of ApolloMDx's Medicare claims data in conjunction with emails and text messages demonstrates THAI knew that the doctors with whom the marketers were working with were in fact referring beneficiaries to ApolloMDx for genetic testing.  On August 31, 2020, MARKETER 1 texted THAI, "[DOCTOR 1] is starting today w Cardio so u will get samples

tomorrow or Wednesday.  So far he has done 2 Medicare today."  A review of the Medicare data shows DOCTOR 1, an Anesthesiologist in Abington, Pennsylvania, as a referring physician with the first date of service as August 31, 2020.  From August 31, 2020, through May 12, 2021, ApolloMDx submitted approximately $242,000 and was paid approximately $193,000 for genetic tests with DOCTOR 1 as the referring provider.

44.     On September 22, 2020, EMPLOYEE 1 sent an email to supplyorder@apollomdx.com and MARKETER 1.  The email requested CGx and cardiogenetic testing kits to be sent to an address on the supply form.  Attached to the email was an "Add New Provider Form" for DOCTORS 2 and 3 in Carmel, New York.  The form purported to be signed by DOCTOR 2 and DOCTOR 3.  During the May 13, 2022, interview, this form was shown to EMPLOYEE 1.  EMPLOYEE 1 described the form as one that sales representatives had to complete for new providers that would be sending samples to ApolloMDx.  A review of the Medicare data shows that from September 28, 2020, through September 1, 2021, ApolloMDx billed approximately $520,000 and was paid approximately $370,000 for genetic testing with DOCTOR 2 as the referring provider.  From October 6, 2020, through October 8, 2020, ApolloMDx billed approximately $73,000 and was paid $46,000 for genetic testing with DOCTOR 3 as the referring provider.  Both DOCTOR 2 and DOCTOR 3 are Internal Medicine doctors.  The marketers' communications with EMPLOYEE 1 and THAI, and the claims data, demonstrate that the payments the marketers were receiving were in exchange for referrals from the doctors that the marketers had relationships with.

45.     In the May 13, 2022, interview, EMPLOYEE 1 advised that THAI was in Vietnam trying to open a new lab and had even shipped her dogs to Vietnam.  In addition, EMPLOYEE 1 stated that THAI is directing ApolloMDx's lab operations from Vietnam and has

had individuals flying back and forth. A review of travel records determined that THAI indeed departed the U.S. on January 25, 2022. She originally had a return flight for May 6, 2022, that she did not take.

46.     THAI is believed to have been residing in Vietnam since January 2022. On June 2, 2022, agents were notified by U.S. Customs and Border Protection that THAI will be arriving on a connecting flight into Los Angeles International Airport on June 5, 2022, and then flying to Newark Liberty International Airport the same day, with a return flight to Vietnam scheduled for June 10, 2022.

## H. Conclusion

47.     Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from in or around December 2019, and continuing through the present, in the Southern District of Texas, and elsewhere, EMYLEE THAI committed violations of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b.

48.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Shannon Brady
Supervisory Special Agent
Federal Bureau of Investigation

Subscribed and sworn to by telephone, and I find probable cause this 4th day of June 2022.

Hon. Sam S. Sheldon
United States Magistrate Judge

13